## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>  Plaintiff, )<br>)<br>v. )<br>)<br>SONNY SAGGAR, M.D., and )<br>RENITA BARRINGER, )<br>)<br>  Defendants. ) | Case No. 4:23-CR-380 |

**DEFENDANTS' MOTION TO DISMISS INDICTMENT BASED ON
THE COURT'S LACK OF JURISDICTION AND MEMORANDUM IN SUPPORT**

COME NOW Defendants, through undersigned counsel, and pursuant to Rule 12(b)(2), move to dismiss the Superseding Indictment based on this Court's lack of jurisdiction due to the misapplication of the Fifth Amendment grand jury mandate.[1] In support of this motion, Defendants state:

In relevant portion, the Fifth Amendment provides:

*No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, . . .*

In more recent history, courts at every level have applied a "probable cause" standard of proof to the decisions of federal grand juries.[2] However, contrary to popular belief, such was not always

---

[1] Under rule 12(b)(2), a "lack of jurisdiction . . . shall be noticed by the court at any time during the pendency of the proceeding." "[T]he indictment is a nullity necessarily implies that the court was without jurisdiction to hear the case." *United States v. Macklin*, 523 F.2d 193, 196 (2d Cir. 1975). Here because the grand jury was instructed from the start to apply an unconstitutional standard, "the defect is one which renders the grand jury's actions void ab initio." *Id.*

[2] "This Court has often recognized the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime." *Kaley v. United States*, 571 U.S. 320, 328, (2014).

1

the case and no Supreme Court decision has ever actually announced that the standard for indictment shall henceforth be "probable cause." Rather, modern courts have simply assumed that to be the standard. As discussed below, "[t]he Constitution demands more than the continued use of flawed criminal procedures." *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Defendants submit that the probable cause standard is contrary to the intent of the Founding Fathers, and consequently, is contrary to the U.S. Constitution.

Under what Justice Scalia termed "original public meaning" originalism,[3] the Supreme Court has made clear, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2136 (2022)(quoting *Heller*, 554 U.S. at 634–635)(emphasis added).[4] "[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 2137. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment; "We must therefore turn to the historical background of the Clause to understand its meaning."); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment: "We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First

---

[3] In his 1986 speech before the Department of Justice, future-Justice Scalia said that the "expressions of the Framers," far from being irrelevant to original public meaning originalism, "are strong indications of what the most knowledgeable people of the time understood the words to mean." Antonin Scalia, Address Before the Attorney General's Conference on Economic Liberties in Washington, D.C. (June 14, 1986), in OFF . OF LEGAL POLICY , U.S. DEP' T OF JUST., ORIGINAL MEANING J URISPRUDENCE : A SOURCEBOOK , 103 (1987).

[4] "The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." *Costello v. United States*, 350 U.S. 359, 362 (1956).

Amendment); *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 376 (1996) (Seventh Amendment: "The right of trial by jury thus preserved is the right which existed under the English common law when the Amendment was adopted.").

It is the original *public* meaning of the Constitution that governs constitutional interpretation. *See District of Columbia* v. *Heller*, 554 U.S. 570, 605 (2008). The Constitution "must be interpreted by 'reference to historical practices and understandings.' … [and] 'has to accord with history and faithfully reflect the understanding of the Founding Fathers…. An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some 'exception.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022).

In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court looked back to the adoption of the Constitution and the Bill of Rights to determine that the simple phrase "a jury trial" found in the Sixth Amendment required a unanimous verdict. Likewise, proper analysis of what the Founding Fathers meant when they said "indictment of a grand jury" must consider what was understood back in 1791 when the Fifth Amendment was adopted.

Currently, in the Eastern District of Missouri, each new grand jury is instructed as to the standard of proof. Specifically, they are instructed that they need only find "probable cause." *See*, https://www.moed.uscourts.gov/sites/moed/files/documents/Jury_HandbookGrandJurors.pdf. In the Eastern District of Missouri, the grand jurors are specifically told their responsibility is to determine "only whether there is probable cause." Handbook for Federal Grand Jurors used in EDMO, at 2. Throughout the Handbook, "probable cause" is referenced eight different times. But, "probable cause" was not the standard circa 1791.

**I.     The Historical Evidence Demonstrates A Higher Standard of Proof**

Viewing the historical background of grand juries and the early case law related to them discloses that the "probable cause" standard of today was, in fact, not the then-accepted standard. Judges of the Founding era rejected the idea that criminal charges required only today's understanding of probable cause. Rather, they told grand juries that they could only indict under a much higher standard.

Tellingly, on April 20, 1790, a year before the Fifth Amendment's ratification, then-U.S. Supreme Court Justice James Wilson, himself a Founding Father,[5] charged the first federal circuit grand jury to sit in Pennsylvania, stating in relevant part:

> The doctrine, that a grand jury may rest satisfied merely with probabilities, is a doctrine, dangerous as well as unfounded: It is a doctrine, which may be applied to countenance and promote the vilest and most oppressive purposes: It may be used, in pernicious rotation, as a snare, in which the innocent may be entrapped, and as a screen, under the cover of which the guilty may escape.[6]

Notably, in 1906, the Supreme Court acknowledged that Chief Justice Wilson was someone "who may be assumed to have known the current practice."[7] *Hale v. Henkel*, 201 U.S. 43, 61 (1906), *overruled by Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52 (1964). Likewise, Pennsylvania's Judge Shippen explained in 1793 that:

> As you hear the Evidence on one Side only, that Evidence should be full and convincing; it is not enough that there are probable Grounds of the Guilt of the party but the proof must be either positive, or strongly presumptive, before you put the party to the Hazard Pain or Expence of a public Trial."

William Ortman, *Probable Cause Revisited*, 68 Stan. L. Rev. 511, 533 (2016).

---

[5] Wilson was elected twice to the Continental Congress, he was one of six men to sign both the Declaration of Independence and the Constitution of the United States and was a major participant in drafting the U.S. Constitution. In fact, James Madison's notes indicate that Wilson spoke 168 times, second only in number to Gouverneur Morris.

[6] James Wilson, Charge to the Grand Jury of the Circuit Court for the District of Pennsylvania (April 12, 1790), *in* 2 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800 (Maeva Marcus ed., 1988).

[7] Though at the time the Court was discussing a slightly different grand jury issue, the assessment of Wilson is just as valid for the issue of probable cause.

In 2012, Stanton Krauss published *Gentlemen of the Grand Jury*, a two volume book containing every previously unknown but still surviving grand jury charge given by American judges prior to 1801.[8] As discussed below, examination of these charges to grand juries reveals that among the American judges of the Founding generation, the position that a grand jury should return an indictment only upon an evidentiary showing more demanding than probable cause dominated. G*entlemen of the Grand Jury: The Surviving Grand Jury Charges from Colonial, State, and Lower Federal Courts before 1801*, vol. 1-2 (2012) (Stanton D. Krauss, ed.). In fact, as late as 1872, then Supreme Court Justice Stephen J. Field in a charge made by him to a grand jury while sitting as Circuit Justice in the District of California, instructed the grand jury:

> To justify the finding of an indictment, you must be convinced, so far as the evidence before you goes, that the accused is guilty; in other words, you ought not to find an indictment, unless in your judgment, the evidence before you, unexplained and uncontradicted, *would warrant a conviction by a petit jury*.

*In re Charge to Grand Jury*, 30 F. Cas. 992, 994, 2 Sawy. 667 (C.C.D. Cal. 1872).[9] Likewise, Chief Justice Robert Taney (who previously was the U.S. Attorney General, i.e., supervisor of all federal prosecutors), sitting as a Circuit Justice in Maryland in 1836 stated in charging a grand jury:

> But in our desire to bring the guilty to punishment, we must still take care to guard the innocent from injury; and every one is deemed to be innocent, until the contrary appears

---

[8] Krauss indicated, "Over the past two decades, I have read every publicly available eighteenth century American newspaper published in English and French and the surviving papers (published and unpublished) of seventeenth and eighteenth century American judges. I have also examined the books and pamphlets published here during those years. My object has been to learn what I could about American law from the colonial period through the Federalist era. These volumes include transcriptions of every complete, partial, or summarized grand jury charge known to have been given before 1801 in what was, or would become, this country."

[9] Justice Field's charge to the grand jury was cited in *Hale v. Henkel*, 201 U.S. 43, 63, and *Hurtado v. People of State of California*, 110 U.S. 516, 555, (1884), and *Ex parte Bain*, 121 U.S. 1, 10, (1887)("The importance of the part played by the grand jury in England cannot be better illustrated than by the language of Justice FIELD, in a charge to a grand jury, reported in 2 Sawy. 667."), **and by the Solicitor General representing the United States.** ***U.S. v. Cotton*, 2002 WL 264766 (U.S.), 26(Brief for the United States).**

5

by sufficient legal proof. You will, therefore, in every case that may come before you, carefully weigh the testimony, and present no one, unless, in your deliberate judgment, the evidence before you is *sufficient*, in the absence of any other proof, *to justify the conviction of the party accused*. And this rule is the more proper, because he is not permitted to summon witnesses or adduce testimony to the grand jury, and your decision must be made without hearing his defence."

*Charge to Grand Jury*, 30 F. Cas. 998, 999 (C.C.D. Md. 1836)(emphasis added). And as late as 1883, the Court in *United States v. Kilpatrick*, 16 F. 765, 772–73 (W.D.N.C. 1883), instructed the grand jury:

> *A grand jury ought not to find a bill upon evidence merely sufficient to render the truth of the charge probable*; their judgments should be convinced that the evidence before them, unexplained and uncontradicted, *would warrant a conviction by a petit jury.*(emphasis added).

*See also*, *In re Charge to Grand Jury,* 30 F. Cas. 976, 976 (C.C.D. Conn. 1867)("It will be your duty, at the present term of this court, to investigate charges against several alleged offenders. The district attorney will see that you are supplied with such evidence as can be obtained, and he will prepare and furnish you with bills covering the offences that you may find proved by the requisite evidence. In order to find a true bill against any person, the proof should be such as, in your judgment, *would warrant a petit jury in pronouncing the accused guilty.*")(emphasis added); *In re Charge to Grand Jury*, 30 F. Cas. 1036, 1038 (C.C.S.D. Ohio 1861)("But in regard to treason, and indeed all other crimes, the jury should reach a rational conclusion, from the law and the evidence, *that the person accused is guilty*, before returning a true bill against him.")(emphasis added); *In re Grand Jury*, 62 F. 840, 847 (N.D. Cal. 1894)("you ought not to find an indictment unless, in your judgment, the evidence before you, unexplained and uncontradicted, *would warrant a conviction by a petit jury.*")(emphasis added).

It is beyond dispute that the right to an indictment by a grand jury is a Constitutional right. "The institution of the grand jury is deeply rooted in Anglo-American history. . . . In this country

6

the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury.'" *United States v. Calandra*, 414 U.S. 338, 342–43 (1974).

The Fifth Amendment makes no mention of any standard of proof, let alone a probable cause standard for the grand jury. Therefore, in interpreting its language, the Supreme Court has made clear that the Constitutional "meaning is fixed according to the understanding of those who ratified it." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Though *Bruen* was a Second Amendment case, the Court noted, "our focus on history also comports with how we assess many other constitutional claims." *Id*. at 2130.[10] The Court "clarified that 'examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification' [is] 'a critical tool of constitutional interpretation.'" *Id*. at 2127-28.

In 2016, William Ortman, the then Climenko Fellow and Lecturer on Law, Harvard Law School, published an article in the Stanford Law Review, *Probable Cause Revisited*. Ortman had conducted a deep dive into the collection of grand jury charges found in *Gentlemen of the Grand Jury*, supra. As Ortman said, "a careful examination of these charges reveals that among the American judges of the Founding era who expressed a view, Justice Wilson's position--that grand

---

[10] The Government would be hard-pressed to dispute the historical analysis method given the Solicitor General has argue such to the Supreme Court:
> Because the Amendment "codified a right inherited from our English ancestors," a court should begin with English law. *Id.* at 2127 (citation omitted). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider evidence of how the Founding generation understood the right. *Id.* at 2136 (citation and emphasis omitted). And because evidence of the "public understanding of a legal text in the period after its enactment or ratification" is probative of original meaning, a court should consider how the Second Amendment was understood in the 19th century. *Heller,* 554 U.S. at 605 (emphasis omitted); see *Bruen,* 142 S. Ct. at 2136-2138.

UNITED STATES v. RAHIMI., 2023 WL 5322645 (U.S.), 13(Brief for the United States).

7

juries should return an indictment only on an evidentiary showing *more demanding* than probable cause--dominated. *Id*., at 520. Ortman noted that "Americans learned about their debate, and generally about the English law of grand juries, in three main ways: reprinted Whig tracts, legal treatises, and justice of the peace manuals," *id.*, at 526, and that American judges "overwhelmingly picked" a higher standard than "probable cause." Noting that the Tories advocated for probable cause standard and the Whigs were proponents of a higher standard, he wrote:

> Founding-era judicial instructions about the quantum of evidence required for an indictment were not uniform, but neither were they closely divided between Whig and Tory views. As this and the next Subparts show, in Founding-era America, among judges who addressed the issue, the Whigs won.
> Several judges adopted Blackstone's "thoroughly persuaded" language. Judge Thomas Waites's 1789 charge to a South Carolina grand jury is typical of this approach: "[Y]our ought to be thoroughly persuaded of the truth of an indictment, as far as the evidence goes, before you assent to it; and ought not to send a person to his trial upon probable grounds only, and the mere presumption of criminality." Other charges told the grand jury to find an indictment only if it was "satisfied," "well satisfied," "fully satisf[ied],"[98] "convince[d]," or "well convinced" of the defendant's guilt. At least two judges incorporated the Whig idea that grand jurors should present a defendant for trial only if their "consciences" were "satisfied." Yet other judges instructed grand juries to find an indictment only with "the most unequivocal evidence," "moral certainty," evidence "sufficient to convict," the "most probable grounds," the "strongest appearance of criminality," or when it had no "reasonable cause of Doubt." **While these formulations offer a range of certainty levels, they share a common theme: all go beyond, and often far beyond, the bare "probable cause" criterion advanced by the English Tories.**

*Id.* at 530-31 (emphasis added). Ortman also found that, "[l]ike the Whigs before them, several Founding-era judges expressly criticized criminal charges based on "probabilities," often in part because, "judges connected a strict evidentiary requirement to the fact that grand jurors heard only the government's evidence."[11]

---

[11]Ortman did also note, "we know that at least six Founding-era American judges charged grand jurors to return an indictment on probable cause alone. Four of them--William Henry Drayton, Henry Pendleton, John Faucheraud Grimke, and Elihu Hall Bay--were from South Carolina, while the other two--Thomas McKean and Richard Peters--presided in Pennsylvania." Id., at 533-34. However, an argument could be made that even "probable cause" suggested a higher standard circa 1791 than it does today.  In Judge Lot Hall's charge to a grand jury in 1797, he told the grand jury that "[y]our duty is not to decide on the guilt of any person, but only to enquire, whether there be sufficient probable cause of his being guilty." But, just

In conclusion, Ortman found that by the end of "the eighteenth century, the Whig/Wilson view of the criminal charging standard seems settled," and "[t]he Whig/Wilson charging standard stood for about the first three-quarters of the nineteenth century. If anything, it grew more entrenched." *Id.* at 540. *See also* Thomas Y. Davies, *The Fictional Character of Law-and-Order Originalism*, 37 Wake Forest L. Rev. 239, 427–28 (2002)("Grand jurors performed that function more rigorously than modern grand juries because they did not merely assess whether there was probable cause for a prosecution; rather, at common law, grand jurors were usually instructed not to indict unless they were persuaded, based on the prosecutor's evidence, of the 'truth' of the accusation."). The grand jury charges cited above and others within *Gentlemen of the Grand Jury* tell a clear story of what the public expected from grand juries.

### A. The Supreme Court's Reliance on William Blackstone Supports A Higher Standard.

The Supreme Court has on several occasions considered historical information from the common law in England relating to grand juries, and specifically from William Blackstone of whose work the Supreme Court has said –"constituted the preeminent authority on English law for the founding generation." *Alden v. Maine*, 527 U.S. 706, 715 (1999).[12] In *Beavers v. Henkel,* 194 U.S. 73, 84 (1904), the Court quotes Blackstone as follows:

---

two lines later he also instructed them that, "I think you cannot be justified in finding a bill, unless the evidence be such against a person, as, in your opinion, would be sufficient to convict on final trial."

[12]*See, e.g.,United States v. Calandra*, 414 U.S. 338, 343 (1974) ("For a discussion of the history and role of the grand jury, see . . . 4 W. Blackstone , Commentaries *301 et seq."); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022)( "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."); *Costello v. United States*, 350 U.S. 359, 363 (1956)("As to the development of the grand jury as an institution here and in England, see . . . 4 Blackstone Commentaries 301 et seq."). And likewise state courts, see*, State v. Lawler*, 221 Wis. 423, 267 N.W. 65, 67 (1936)(Supreme Court of Wisconsin)("ought to be thoroughly persuaded of the truth of an indictment."); *Conniff v. Luzerne Cnty.*, 30 Pa. Super. 383, 385 (1906)("The measure of proof required to find a true bill is laid down by Blackstone (4 Comm. 303) as follows: "In order to find a true bill a grand jury ought to be thoroughly persuaded of the truth of an indictment so far as their evidence goes; and not to rest satisfied merely on remote probabilities; a doctrine which might be applied to very oppressive purposes."); *Smith v. State*, 61 Miss. 754, 757

Blackstone says (vol. 4, p. 303):

'This grand jury are previously instructed in the articles of their inquiry, by a charge from the judge who presides upon the bench. They then withdraw, to sit and receive indictments, which are preferred to them in the name of the King, but at the suit of any private prosecutor; and they are only to hear evidence on behalf of the prosecution; for the finding of an indictment is only in the nature of an inquiry or accusation, which is afterwards to be tried and determined; and the grand jury are only to inquire, upon their oaths, whether there be sufficient cause to call upon the party to answer it. **A grand jury, however, ought to be <u>thoroughly persuaded of the truth</u> of an indictment, so far as their evidence goes; and not to rest satisfied merely with remote probabilities: a doctrine that might be applied to very oppressive purposes.**'

In *Beavers,* the Court simply assumed the probable cause standard without any discussion at all. This notwithstanding that Blackstone clearly indicated a standard higher than mere probable cause, i.e., "thoroughly persuaded of the truth." Then in *United States v. Williams,* 504 U.S. 36, 51, (1992), the Court quotes from a portion of the exact same passage and acknowledges that Blackstone's Commentary "described the prevailing practice in 18th-century England."

Likewise, in 1913, the Court in the Western District of Missouri, in addressing Backstone's position quoted above, stated, **"[t]he statement made by Blackstone, who died in 1780, of the procedure before a grand jury, may be taken as a correct view of the procedure as it existed in his time."** *United States v. Bolles*, 209 F. 682, 685 (W.D. Mo. 1913).

The Supreme Court has frequently relied on Blackstone to understand the historical meaning of American law. On the question of the standard of proof for a grand jury, Blackstone's commentary fully demonstrates a standard higher than probable cause. Such a conclusion is in complete accord with the charges to grand juries circa 1791.

---

(1884)("A jury ought to be thoroughly persuaded of the truth of an indictment so far as their evidence goes, and not to rest satisfied merely with remote probabilities—a doctrine that might be applied to very oppressive purposes. 4 Wendell's Black-stone Com., p. (top) 302; 1 Chitty's Crim. Law 318, 319."); *Bennett v. Kalamazoo Cir. Judge*, 183 Mich. 200, 204, 150 N.W. 141, 142 (1914)("In order to determine the question in issue, it becomes necessary to ascertain, if possible, what duties and functions devolve upon the grand juries in this jurisdiction. Blackstone, in his Commentaries, book 4, page 301, defines the procedure as follows . . .").

10

### B. The Department of Justice Also Relies on Blackstone

Moreover, the United States Solicitor General has also relied on Blackstone to provide the historical understanding of the grand jury.

> Starting in the seventeenth century, the English grand jury began to function as a body that protected the innocent from unfounded charges. For example, in 1681, grand juries refused to indict two political enemies of King Charles II, the Earl of Shaftesbury and Stephen Colledge, for treason. See *United States v. Navarro-Vargas,* 408 F.3d 1184, 1190-1191 (9th Cir.), cert. denied, 126 S. Ct. 736 (2005). Reflecting that practice, commentators observed that the role of the grand jury was to protect against unsubstantiated charges. Blackstone wrote that the function of the grand jury was to determine "whether there be sufficient cause to call upon the party to answer [the accusation]," and added **that "[a] grand jury *** ought to be thoroughly persuaded of the truth of an indictment so far as their evidence goes, and not to rest satisfied merely with remote probabilities." 4 William Blackstone,** ***Commentaries on the Laws of England* \*303.**

*United States of America v. Resendiz-Ponce*, 2006 WL 1794485 (U.S.), 28-29(Brief for the United States)(emphasis added).[13] In fact, in *Costello v. U.S.*, 1955 WL 72457, 21 (U.S., 2006)(Brief for the United States), the Solicitor General acknowledged that Blackstone's words and other historical writings suggested a standard higher than probable cause:[14]

> There are, it is true, occasional observations to the effect that since the accused has no chance to present evidence to the grand jury, **the "proof of the offence should be substantial"** (2 Hawkins, *Pleas of the Crown,* 367), and that a "grand jury * * * ought to be thoroughly persuaded of the truth of an indictment, so far as their evidence goes; and not rest satisfied merely with remote probabilities: a doctrine that might be applied to very

---

[13] The United States Solicitor General has also relied on a portion of this same Blackstone quote in *U.S. v. Williams*, 1991 WL 521337 (U.S.), 13 n.3 (Brief for the United States)(1991). Though the Government misquoted Blackstone referring to "remote possibilities," it came from the same key sentence which included "thoroughly persuaded of the truth of an indictment."

[14] Such statements and acknowledgements by the Solicitor General in a submission to the Supreme Court is of great import. "Ultimately, it is the responsibility of the Solicitor General **to ensure that the United States speaks in court with a single voice** -- a voice that speaks on behalf of the rule of law." *Presenting the Case of the United States As It Should Be": The Solicitor General in Historical Context* **,** Seth P. Waxman, Solicitor General of the United States, June 1, 1998.(emphasis added) Found at, http://www.justice.gov/osg/about-office. As Mr. Waxman noted, "[i]n 1866 the Supreme Court held, in a case called *The Gray Jacket*, [ 72 U.S. (5 Wall.) 370 (1866)] that "where the United States appeared through the Attorney General or his representative, **no counsel could be heard taking a conflicting position on behalf of another department of the government**." *Id.* (emphasis added).

11

oppressive purposes." 4 Blackstone, *Commentaries* (Chitty, 1866), 247. And see 1 Chitty, *Criminal Law* (1847 Ed.) 318-319. (emphasis added).

Though the Government attempted to dismiss the evidence of a higher standard of proof by claiming the authors were merely giving "advice,"[15] the available evidence compellingly indicates American courts very much accepted Blackstone's "advice." In fact, multiple judges in multiple different jurisdictions used portions or all of Blackstone's exact wording in their charges to grand juries, i.e., "ought to be thoroughly persuaded of the truth of an indictment, so far as their evidence goes; and not rest satisfied merely with remote probabilities."[16] In other words, the fact historical evidence indicates American courts circa 1791 adopted Blackstone's "advice," clearly reflects the public understanding of the Grand Jury Clause at the time it was adopted.

### C. The Standard of 1791 Must Be The Standard of Today.

Why the grand jury charge slipped into probable cause in the 20th century is irrelevant.[17] "[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning

---

[15] "But such commentaries seem to have been only in the nature of advice." *Costello v. U.S.,* 1955 WL 72457 (U.S.), 21-22 (U.S., 2006)(Brief of the United States).

[16] See, e.g., *Gentlemen of the Grand Jury,* at 109 (Judge Houstoun's Charge, Chatham County, Georgia, January, 1792), at 570 (First Report of Judge Pickering's Charge to the Grand Jury, New Hampshire, September, 1790), at 726 (Judge George Turner, Northwest Territory, April 1794), at 1243 (Judge Thomas Waite, South Carolina, 1789).

[17] Though court's will not put a number on it, probable cause is a significantly lower standard than preponderance of the evidence, which itself is only anything over 50%. "Probable cause, we have often told litigants, is not a high bar." *Kaley v. United States*, 571 U.S. at 338. Troubling, the *Kaley* Court claim the low standard was "stemming from our recognition that probable cause served only a gateway function." *Id*., at 338-39. But the idea that the grand jury "served only as a gateway function" was anything but true circa 1791. To the contrary, the American sentiment after the Revolution was that of fear of excessive prosecutorial power. As Supreme Court Justice Wilson, said in his 1790 grand jury charge:

> The executive power, of prosecuting crimes and offences, might be dangerous and destructive, if exercised *solely* by Judges *occasionally* appointed, or appointed *during pleasure*, for that purpose. To prevent this, two precautions are used. . . . [One] is, that a double barrier--a presentment, as well as a trial by jury--is placed between the liberty and security of the citizen, and the power and exertions of administration.

Sadly, the Supreme Court has had occasion to note that the grand jury may no longer in fact "serve its historical role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." *United States v. Dionisio,* 410 U.S. 1, 17 (1973); see also *United States v. Mara,* 410 U.S. 19, 45-46 (1973) (Marshall, J., dissenting). Many have observed that the modern grand jury is not exactly a

12

of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 142 S. Ct. at 2137. The change was not the result of a Constitutional Amendment – the Fifth Amendment has not been altered. And, if the Fifth Amendment requirement of "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," has not been altered, then its meaning must be the same as it was in 1791. Therefore, its meaning must be "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."

The Eighth Circuit's holding in *Doe v. Bell*, 969 F.3d 883, 889-90 (8th Cir. 2020) is instructive. As the Court noted, "[t]he United States Constitution 'presumes a role for the grand jury' in American criminal procedure through the Fifth Amendment, . . . and the Supreme Court has previously indicated that '[t]here is every reason to believe' the American grand jury 'was intended to operate substantially like its English progenitor.' . . . When the institution of the grand jury crossed from England to the American colonies, the rule of grand jury secrecy came with it." The Framers also included the Grand Jury Clause in the Fifth Amendment when the institution of the grand jury required more than mere probable cause, thus, just like secrecy, making more than probable cause "an implicit part of American criminal procedure."

## II.     The Court Lacks Jurisdiction.

Fifty years ago, courts recognized that a grand jury indictment issued after expiration of its term made the indictment invalid – "an indictment returned by a grand jury sitting beyond its legally authorized time is a nullity." *United States v. Fein*, 504 F.2d 1170, 1180–81 (2d Cir. 1974). The same must be true here. "[T]he fifth amendment precluded any proceeding against an individual for any capital or infamous crime except upon the presentment or indictment of a grand

---

robust check on prosecutorial discretion. *United States v. Navarro–Vargas,* 408 F.3d 1184, 1195 (9th Cir.2005) (en banc) (citing commentators and courts that have suggested that the modern grand jury is but a rubber stamp for the prosecution); *United States v. Budd,* 496 F.3d 517, 537 n. 9 (6th Cir.2007) (Cook, J. concurring and dissenting in part) (citing the adage that the grand jury "would indict a ham sandwich").

jury." *Id*. A grand jury that operates under the unintended standard of probable cause is not the "Grand Jury" contemplated by the Founding Fathers or, therefore, contemplated by the Constitution. If the meaning of grand jury includes the appropriate standard of proof – that known at the time of the Amendment's adoption – then failure to operate under that standard of proof means the entire operation of the grand jury is illegitimate. Consequently, any indictment arising from such unintended probable cause standard is a nullity.[18] The courts have no jurisdiction over indictments which are null and void. As Chief Justice Marshall in *United States v. Hill*, 26 Fed.Cas. p. 315 (No. 15,364) (C.C.Va.1809), sitting as a Circuit Justice stated:

> It has been justly observed that no act of congress directs grand juries or defines their powers. By what authority, then, are they summoned, and whence do they derive their powers? The answer is that the laws of the United States have erected courts which are invested with criminal jurisdiction. This jurisdiction they are bound to exercise, and it can only be exercised through the instrumentality of grand juries.

"[T]he indictment is a nullity necessarily implies that the court was without jurisdiction to hear the case." *United States v. Macklin*, 523 F.2d 193, 196 (2d Cir. 1975). "The caselaw supports the view that an invalid indictment is a nullity." *United States v. Bolton*, 893 F.2d 894, 899 (7th Cir. 1990). *United States v. Armored Transport, Inc.,* 629 F.2d 1313, 1316 (9th Cir.1980). ("Such a defect—that the grand jury lost its power to hand down indictments—is jurisdictional and may be raised at any time."); *Ex parte Bain*, 121 U.S. (1887)*("*the jurisdiction of the offence is gone*"* because the case was not "properly presented by indictment*.*").

Yes, Defendants are asking the Court to go against a long-standing practice. But, the long-standing practice is contrary to the original intent of the Framers. And, as the Supreme Court said

---

[18] As noted by the Second Circuit, "[i]t may well be that criminal proceedings which would be in the public interest will be frustrated and that those who might be found guilty will escape trial and conviction. However, it is fundamental to our jurisprudence that the rule of law must prevail and that the prosecution of those suspected of crime must itself proceed according to the law, and not otherwise." *United States v. Fein*, 504 F.2d 1170, 1172 (2d Cir. 1974).

14

in finally condemning the rule in Oregon and Louisiana that a criminal jury verdict did not have to be unanimous, and concluding that the Sixth Amendment required unanimous verdicts even though not stated in the Amendment: "Even if we accepted the premise that *Apodaca* [upholding less than unanimous verdicts] established a precedent, no one on the Court today is prepared to say it was rightly decided, and *stare decisis* isn't supposed to be the art of methodically ignoring what everyone knows to be true." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1404–05 (2020).

## CONCLUSION

The damage an indictment can wreck upon an individual is immeasurable. First, there are the often times draconian bond conditions, restrictions on travel, and the like. But, the permanent damage that can befall a defendant without ever being convicted is undeniable. Damage to one's reputation, damage to business relations, the untold impact on an individual's health, the potential loss of occupational licenses all are reasons a standard of proof of probable cause is inappropriate.

The Grand Jury was considered so important by the Founding Fathers that the Bill of Rights included an amendment guaranteeing the right of an indictment by a Grand Jury because of that institution's centrality to fighting the Crown. The above clearly establishes that when the Fifth Amendment was adopted, the Grand Jury Clause provided more protection than mere probable cause. Because the Fifth Amendment remains intact, the same level of protection must exist today.

Because the grand jury was instructed incorrectly on the most fundamental aspect of its duties, the Indictment is void and therefore this Court lacks jurisdiction over this matter.

Dated: October 6, 2023                    Respectfully submitted,

                                          **DOWD BENNETT LLP**


By: */s/ James G. Martin*
    James G. Martin  #33586 MO
    James B. Martin  #70219 MO
    7676 Forsyth Blvd., Suite 1900
    St. Louis, MO  63105
    314/889-7300 (Telephone)
    314/863-2111 (Facsimile)
    jmartin@dowdbennett.com

*Attorneys for Defendant Sonny Saggar, M.D.*

   /s/ William J. Ekiss
   William J. Ekiss (#47389)
   5770 Mexico Rd., Ste A
   St. Peters, MO 63376
   Email: billekiss@lampinlaw.com

*Attorney for Defendant Renita Barringer*


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 6, 2023, a copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all counsel of record.

                                          */s/James G. Martin*