UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:23-CR-380 |
| ) | |
| SONNY SAGGAR, M.D., and ) | |
| RENITA BARRINGER, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT SAGGAR'S RESPONSE TO THE GOVERNMENT'S "BRIEFING" REGARDING HIS MOTION SEEKING PERMISSION TO TRAVEL TO ENGLAND TO SEE HIS 93 YEAR OLD MOTHER**

Dr. Saggar respectfully states that the Government's opposition to the travel request is unfounded. First, EPCI is a legally established Delaware corporation, see Exhibit 1, and Monica Saggar is the sole owner of that company, see Exhibit 2. Those are documented facts. Therefore, unless prohibited by an order by some court, Monica Saggar has the power and authority to obligate the company and any of its properties. The property located at 217 North 10th Street, St. Louis, Missouri is the proposed property for the bond. The Chesterfield Title Agency Letter Report, from earlier this month, see Exhibit 3, shows EPCI as the legal owner, and the property having no mortgages or outstanding judgments.

The Government claims that EPCI is "prohibited by the St. Louis County Court from encumbering any of its real property during the pendency of the divorce action." On a legal basis, defense counsel disagrees.[1] However, Defendant fully understood the concern expressed

---

[1] The Government relies upon a general standing order in the divorce proceedings based on St. Louis County Circuit Court Local Rule 68.3(2)(F)), Gov't. Ex. 11 at 2-3, asserting its applicability. Even if the Government could have believed that the above provision applied to third party EPCI, it failed to note Rule 68.3(3):

by the Court at the hearing on November 20, 2023. Therefore, to eliminate any debate as to the availability of the anticipated property, attorneys representing EPCI and Dr. Saggar in the divorce proceedings reached an agreement with Mrs. Saggar's counsel and the court in order to alleviate any of this Court's concerns. Attached hereto is Exhibit 4, a Judgment/Order agreed to by the parties on November 28, 2023, and signed by the court November 29th. The Judgment/Order applies specifically to 217 N. 10th Street in St. Louis. While for the purpose of resolution, the parties agreed the property would be covered by the St. Louis County Circuit Court Local Rule 68.3 and the August 25, 2023 Consent Order, the parties also agreed that the property would be excluded from such court orders specifically to enable Dr. Saggar's sister, through EPCI, to put the property up as bond for Dr. Saggar to travel to England (should the Court grant such travel). In other words, the St. Louis County Court, Mrs. Saggar and her counsel, and EPCI have blessed the use of the property as security for the federal bond.

Moreover, as the Court can see from the Judgment/Order, EPCI (Dr. Saggar's sister) has agreed to put up five additional properties within the divorce proceedings to protect Mrs. Saggar in the unimaginable event Dr. Saggar did not return from England. Were Dr. Saggar to fail to

---

(3) Duration. The terms of the Order shall continue in effect **until further order of the Court.** Either party may request a hearing to modify the Order by motion to the Court in the division to which the case has been assigned. (emphasis added)

The standing order only applies, if ever, "until further order of the Court." There was a further order, which is Exhibit 13 of the Government's pleading. Doc. 69-13. That Order was a Consent Order signed by all parties. It provides that "**[n]o real estate owned by EPCI that was transferred/sold to EPCI by Husband** will be further encumbered beyond the loans, mortgage, liens or notes that are currently in place without the consent of the parties or by further order of the Court." (emphasis added)  Under the standing order of St. Louis County, the Consent Order – clearly a "further order of the Court" – terminates the duration of the general standing order. Yet, this prohibition consented to by EPCI explicitly only applies to real estate it acquired from Dr. Saggar.

The intended property was not owned by Dr. Saggar (or Mrs. Saggar or any entity in which they had any ownership interest) and was never transferred to EPCI by Dr. Saggar. The property was bought from "217 Partnership LLP." There is no evidence that Dr. Saggar was a part of this partnership and he was not. Therefore, it is not encumbered by the divorce proceedings. The Government even acknowledges in a footnote that it has no evidence the property was transferred to EPCI by Dr. Saggar. Doc. 69 at 5.

comply with whatever travel conditions the Court imposed, not only would EPCI (Dr. Saggar's sister) forfeit the 217 10th Street property pursuant to the federal matter, but she would also lose the five additional properties through the St. Louis County Court. In other words, Dr. Saggar's sister, who lives with their mother in England, is demonstrating with significant financial assets that her brother will comply with any travel orders of this Court.[2]

As to the Government's claim that Dr. Saggar is a clear flight risk, the Government's psychoanalysis of Dr. Saggar's writings to his wife, if nothing else, is certainly offensive. Quoting his expressions to his wife that he wanted to give up his material possessions does not in any way support the Government's claim that he has "a desire to forego all ties to the United States." Importantly, nothing within his communications with his wife indicates he would be willing to break the law to live again in England.

The ability to take certain statements out of context is unfair to say the least. For instance, while the Government points the Court to a statement that Dr. Saggar's friends have "vanished," Doc. 69 at 6, missing is the rest of the sentence (which is blacked out on the Government's exhibit, but so poorly done it can all be read), which reads, "but I do thankfully have a list of friends who have stayed in my circle and call me regularly, sometimes for an hour or two at a time." Why was this blacked out? Why quote only half a sentence? Again, the psychoanalysis is unbecoming and to suggest Dr. Saggar is friendless when he said just the opposite within the same sentence is problematic.

The Government likewise claims that in the letter "Dr. Saggar reiterates the advantages of relocating to England" (quoting "I'm still licensed and welcome to work as an ER doc in the UK." Doc. 69 at 5), but leaves out the easily read blacked out portion of the same sentence, "but

---

[2] The additional three properties are worth a minimum of another million dollars, and likely much more than that.

then I don't think Harry/Sonya would want to see me very much over there. So I'm crying about this and I don't know whom to turn to or what to say." Of course, when the blacked out portion is included, England appears unappealing for the specific reason of wanting to have time with his children.

Then the Government takes a quote out of context to imply that Dr. Saggar might be suicidal—when in fact, within that same letter he specifically says, "I'm not suicidal."

The selective discussion of partial sentences and twisting of an emotional man's words is disappointing to say the least. And, it provides no valid basis to claim Dr. Saggar is a significant flight risk. Moreover, obviously the risk of causing his sister to lose multiple pieces of valuable property is most certainly strong motivation to visit his mother and then come back to deal with these criminal charges.[3]

---

[3] It is worth noting that the Government has not denied the significant flaw within the Indictment. In Dr. Saggar's original motion to travel to see his mother it was pointed out that:

> [O]ne of the key foundational allegations within the Indictment is critically wrong, thus greatly diminishing the breadth of any issue of wrongdoing in this case. Specifically, in Paragraph 2 of the Indictment, the grand jury alleges that the co-defendant, Ms. Barringer, was the office manager of SLGH, and "[a]s office manager of SLGH, Barringer's responsibilities included . . . billing." Then in Paragraph 35 and 36, the grand jury again claimed, "Barringer submitted all SLGH claims billed to [Medicaid and Medicare]."
>
> In the Count I conspiracy, the Indictment alleges that Defendants conspired "to make false and fraudulent representations to Medicare and Medicaid regarding healthcare services provided at SLGH in order to make money and profit," Para 26, and that Defendants "caused Medicare to be billed for services . . as if they were provided by Dr. Saggar, when in fact those services were provided by APs." Then, in Counts 2 through 9, each alleges a false billing and having reincorporated previous paragraphs including 2, 35, and 36, thereby alleging the bills were submitted by Barringer. In other words, the entire Indictment revolves around false billings.
>
> But, the Government got one fact terribly wrong. For all relevant times in the Indictment, Ms. Barringer had no responsibility for submitting bills to Medicare or Medicaid, or to anyone else for that matter. Rather, SLGH had long ago engaged an outside billing service to handle all of its billing, whether to governmental agencies or private insurance companies.

Dated: November 30, 2023　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　**DOWD BENNETT LLP**


　　　　　　　　　　　　　　　　By: */s/ James G. Martin*
　　　　　　　　　　　　　　　　　　James G. Martin  #33586 MO
　　　　　　　　　　　　　　　　　　James B. Martin  #70219 MO
　　　　　　　　　　　　　　　　　　7676 Forsyth Blvd., Suite 1900
　　　　　　　　　　　　　　　　　　St. Louis, MO  63105
　　　　　　　　　　　　　　　　　　314/889-7300 (Telephone)
　　　　　　　　　　　　　　　　　　314/863-2111 (Facsimile)
　　　　　　　　　　　　　　　　　　jmartin@dowdbennett.com

　　　　　　　　　　　　　　　　*Attorneys for Defendant Sonny Saggar, M.D.*

---

　　　　The Government missed the most critical fact related to any claim of false billings, i.e., who was the biller. Had the Government pursued this very critical fact, it would have easily discovered that the outside billing service, an owner-operator entity run by Jeff Donaldson, simply misunderstood the proper method of billing APs and Dr. Ali. As Mr. Donaldson has acknowledged to Dr. Saggar's counsel, Mr. Donaldson, without any bad intent, used an incorrect methodology to create the billings for work done by APs and Dr. Ali. We understand the Government has now become aware of these facts.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 30, 2023, a copy of the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system on all counsel of record.

/s/James G. Martin