UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | )  No. 4:23-CR-00380-SRC |
| | ) |
| v. | ) |
| | ) |
| SONNY SAGGAR, M.D., and | ) |
| RENITA BARRINGER, | ) |
| | ) |
| Defendants. | ) |

**UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR REVIEW OF A RELEASE ORDER PURSUANT TO 18 U.S.C. § 3145**

COMES NOW the United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Amy E. Sestric and Cort A. VanOstran, Assistant United States Attorneys for said District, and respectfully requests review of a release order, namely, the Court's Order Granting Motion to Travel (ECF No. 74), pursuant to 18 U.S.C. § 3145.  The Government specifically requests that the Court revoke the Order Granting Motion to Travel or, in the alternative, amend the conditions of Defendant Sonny Saggar, M.D.'s release to expressly prohibit international travel:

**INTRODUCTION**

On October 25, 2023, Defendant Sonny Saggar, M.D. ("Dr. Saggar") made the "unusual request" to travel abroad to England—where he has citizenship and family—while on bond.  (Def. Saggar's Mot. Seeking Permission to Travel to England to See His 93 Year Old Mother ("Motion to Travel Abroad"), ECF No. 54 at 1.)

Dr. Saggar, however, poses a substantial risk of flight if permitted to return to his home country where he cannot be supervised.  In emails to his wife, Dr. Saggar states that he has nothing

left in the United States and that he wishes to move to England and use his license to practice medicine there.  He feels he is treated like a criminal in this country, will not be employable as a physician here, and dislikes the American justice system.  He talks of abandoning all material possessions and living a new lifestyle in an ashram.  And despite arguing to this Court that two of his three children live in this country and provide ties to the community, in an email to his wife, he offers to relinquish custody of his children to her.  Dr. Saggar's statements, further described later in this brief, are hallmarks of an individual who poses a flight risk.

As part of his request to travel internationally, Dr. Saggar offered as collateral "his sister's . . . property in St. Louis (which she bought for over $1,000,000 and is unencumbered) to ensure his timely return." (*Id.* at 4.)  Since Dr. Saggar made that proposal, however, it has become clear that the proffered piece of property was not free to be pledged at the time Dr. Saggar represented it to be.  Rather, it was being held by a sham entity designed by Dr. Saggar to receive and hold fraudulently transferred marital assets.  As a result of its suspicious nature, the entity, Emergency Physician Consultants, Inc. ("EPCI"), is party to Dr. Saggar's ongoing and protracted divorce proceedings, and the disposition of its myriad assets is in dispute in that case.  Although Dr. Saggar recently obtained conditional consent to release the property from EPCI as collateral, his initial distortion of the facts showcases he cannot be trusted to travel abroad without supervision.  Moreover, it has become increasingly apparent that the single piece of property that Dr. Saggar offers as collateral is only one of a host of assets in which he has a financial stake and, as a result, provides him little incentive to return to the United States if allowed to leave.

## PROCEDURAL POSTURE

### The Indictment

On July 26, 2023, a federal grand jury charged Dr. Saggar and defendant Renita Barringer ("Barringer") with one count of conspiracy (in violation of 18 U.S.C. § 371) and eight counts of making false statements related to health care matters (in violation of 18 U.S.C. §§ 1035 and 2). Specifically, the Indictment (ECF No. 1) charges Dr. Saggar, a medical doctor, and Barringer, his office manager, with fraudulently billing Medicare and Missouri Medicaid for claims for services arising out of their Creve Coeur and downtown St. Louis urgent care facilities. (Indictment, ECF No. 1 ¶¶ 1-2, 29, 37, 42.) Broadly speaking, the Indictment alleges that Dr. Saggar and Barringer hired inadequately trained and unsupervised "assistant physicians" or "APs"—*i.e.* medical school graduates who have not completed a residency program—and then billed for those APs' services as if Dr. Saggar himself had performed them, even when Dr. Saggar was out of town. (Indictment, ECF No. 1 ¶¶ 4, 29, 37.)

### Release on Bond

On July 27, 2023, the Honorable John M. Bodenhausen issued an order setting conditions of Dr. Saggar's release, including that Dr. Saggar—a dual citizen of the United States and the United Kingdom—surrender both his United States and United Kingdom passports, that he submit to location monitoring technology, and that he remain in the Eastern District of Missouri unless given written permission to travel outside the district by the United States Pretrial Services Agency ("Pretrial Services"). (Order Setting Conditions of Release, ECF No. 11 at 2-3.) Dr. Saggar was also explicitly instructed that he must avoid all contact with Barringer. (Order Setting Conditions of Release, ECF No. 11 at 2.)

Only a few days later, and before any of these conditions changed,[1] Dr. Saggar admitted to Pretrial Services to having communication with Barringer, in violation of the conditions of his bond and despite Barringer reminding him "multiple times during their conversation that they were not to have any contact with each other." (Informational Report, ECF No. 43 at 2.) The following month, Dr. Saggar violated the conditions of his bond by traveling to the Southern District of Illinois without permission to purportedly check on a property that he was monitoring as an employee of EPCI. (Violation Report, ECF No. 50 at 1.) Because Dr. Saggar could not provide verification of employment by EPCI, Pretrial Services continued to oppose Dr. Saggar's ability to travel for such purposes and no modifications to Dr. Saggar's bond have been made on that basis. (*See id.* at 2.)

### Dr. Saggar's Motion to Travel Abroad

On October 25, 2023, Dr. Saggar filed his Motion to Travel Abroad (ECF No. 54). The Government opposed the Motion to Travel Abroad, and the Court set a hearing on the matter for November 20, 2023. In the interim, the United States learned that the property that Dr. Saggar intended to offer as collateral for his return was not, as he had indicated, free to be pledged, and was instead held by EPCI, a party to Dr. Saggar's divorce proceedings whose assets are in dispute in that state court case. The United States also obtained emails between Dr. Saggar and his wife in which he discusses his desire to live abroad and his dwindling reasons to stay in this country. As a result, on the Saturday prior to the hearing, the United States filed a brief summarizing these

---

[1] Dr. Saggar's conditions were subsequently modified to allow limited types of communication with Barringer (in part due to a joint defense agreement) and to allow Dr. Saggar certain limited travel outside of the district for purposes of working as a locum tenens physician at certain hospitals.

issues. (*See generally* United States' Pre-Hearing Br. Regarding Def. Saggar's Mot. to Travel, ECF No. 69.)

To allow Dr. Saggar time to respond to the Government's arguments, the Court continued the hearing on the Motion to Travel Abroad until December 4, 2023. Following oral argument, the Court granted the Motion to Travel Abroad the same day, but stayed its order until December 11, 2023, to permit the United States the opportunity to seek further review by a United States District Judge. (Order Granting Mot. to Travel, ECF No. 74 at 4.)

## LEGAL STANDARD

"If a person is ordered released by a magistrate judge . . . (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . . ." 18 U.S.C. § 3145(a)(1). This Court reviews an order of release under a *de novo* standard. *See United States v. Maull*, 773 F.2d 1479, 1481, 1485 (8th Cir. 1995) (finding district court "had the duty under the Bail Reform Act to deny release" after finding that no conditions of release could assure appearance). "The power to decide must finally reside in the Article III court" and this "substantial responsibility" must not "be diminished by the earlier action of a magistrate." *Id.* at 1486.

## ARGUMENT

Dr. Saggar should not be permitted to travel internationally while under federal indictment. Dr. Saggar has familial and career ties abroad, in the very country to which he seeks to travel, and by his own admissions, he wants to relocate from the United States, is willing to relinquish child custody, and wishes to pursue a career abroad. In the United States, Dr. Saggar must contend with not only the present criminal prosecution, which exposes him to potential prison time, but also with a variety of actual and potential civil liabilities that far out-value the collateral he seeks to

5

offer to secure his return.  The collateral, in fact, is a piece of property owned not by his sister, as Dr. Saggar originally represented, but by a company she purportedly owns.  In reality, that company is a sham entity that Dr. Saggar uses to divert marital properties.  Contrary to the findings in the Order Granting Motion to Travel (ECF No. 74), the United Kingdom's extradition treaty—and the extensive time and resources it would take the United States to enforce it if Dr. Saggar absconds—is not a sufficient security to reasonably assure the appearance of Dr. Saggar in this case, as contemplated by 18 U.S.C. § 3142(c).[2]  As further explained below, the United States strongly opposes Dr. Saggar's request to travel abroad.

**A.      Dr. Saggar Is a Substantial Flight Risk.**

The Court should deny Dr. Saggar the extraordinary privilege of traveling abroad while on bond because he is, for a variety of reasons, a substantial flight risk.  Dr. Saggar has deep familial ties to the United Kingdom (including one adult child living there), a license to practice medicine there, as well as dual citizenship of both the United Kingdom and the United States.  In contrast, as set forth below, his connections to the United States are lessening each day, and his own statements signal his intent to relocate abroad.

**1.      Dr. Saggar's Ties to this Country Are Weakening.**

Dr. Saggar's ties to the United States are quickly deteriorating.  As an initial matter, the instant case is not the only legal matter with which Dr. Saggar must contend in this country.  In addition to this criminal matter, Dr. Saggar's urgent care entities are also facing a judgment of

---

[2] For similar reasons, Dr. Saggar's offer to waive defenses to extradition (Def. Saggar's Supp. to His Mot. to Travel Abroad, ECF No. 73 ¶ 4) is an "empty gesture." *United States v. Zhang*, No. 22-CR-208-4 (CBA), 2022 WL 17420740, at *5 (E.D.N.Y. Aug. 3, 2022) ("Zhang's agreement to waive extradition is 'an empty gesture' which 'comes into p[l]ay only after [he] has fled the Court's jurisdiction' and is of unclear enforceability.") (quoting *United States v. Epstein*, 425 F. Supp. 3d 306, 325 (S.D.N.Y. 2019)), *aff'd* 55 F.4th 141 (2d Cir. 2022).

6

over $95,000, with interest accruing at nine percent per annum, in a wage and hour law claim that resulted in a jury trial this year. (*See* Sept. 12, 2023 Judgment in *Dalhover v. Creve Coeur Urgent Care, LLC, et al.*, Ex. 1 at 5). He and his entities are liable for yet another $210,000 in a separate, federal Fair Labor Standards Act case in this District. (*See* Sept. 22, 2022 Opinion, Mem., & Order in *Anderson v. Creve Coeur Urgent Care, LLC, et al.*, Ex. 2 at 1-2, 10.) Dr. Saggar's Missouri medical license is also at risk due to an ongoing investigation being conducted by the Missouri Board of Registration for the Healing Arts ("MBHA")—the state agency responsible for the administration of physician licenses—and he is further in the midst of a contentious divorce that he initiated. As further discussed later in this brief, his soon-to-be ex-wife is accusing him of selling and transferring marital assets. In addition to all of this, Dr. Saggar is the target of a parallel federal civil investigation that would subject him to treble damages and mandatory penalties under the False Claims Act if the matter results in litigation and the United States prevails at trial. 31 U.S.C. § 3729(a)(1). Collectively, the liabilities that Dr. Saggar is facing from various legal investigations and cases in this and other matters are well over the value of the property he purports to pledge as collateral.

Extensive legal matters are not the only reason Dr. Saggar's ties to this country are becoming increasingly negligible. As of at least October of this year, Dr. Saggar was no longer employed in the various locum physician positions that he originally reported having to Pretrial Services (Violation Report, ECF No. 50 at 1), and he was granted permission to change his residence to a property owned not by himself, but by his sister. (*See* Def. Saggar's Mot. Seeking Permission to Change Residences, ECF No. 46, Dkt. Text Order, ECF No. 48.) In short, Dr. Saggar's familial, employment, and property ties to the United States have waned to the point that

7

they no longer constitute attachments to this District sufficient to ensure his continued appearance if he is permitted to leave the country.

### 2. Dr. Saggar's Own Statements Show His Intent to Flee.

Dr. Saggar's status as a flight risk is not merely circumstantial; it is confirmed by his own statements about his desire to leave this country to relocate to the United Kingdom—the very country to which he now seeks to travel.  In a May 2023 email, Dr. Saggar informs his wife that "[y]es, [he] do[es] want to go and live in England again" and that he is "willing to give [her] . . . as much child custody as [she] want[s]."  (May 29, 2023 Saggar Email,[3] Ex. 3 at 1-2.)  More recently, in an August 2023 email (after this case was indicted), Dr. Saggar reiterates the advantages of relocating to England, stating:

> My income is not even a shadow of what it once was and at least one of my kids doesn't want to know me, and my Mum is turning 93 next month. **I'm still licensed and welcome to work as an ER doc in the UK**, albeit for a much lower income.

(Aug. 18, 2023 Saggar Email, Ex. 4 at 5 (emphasis added.))

Dr. Saggar's comments about England are in stark contrast to how he views his living situation in the United States, whose justice system he describes as "the *wonderfully wise* American legal system . . . (yes I'm being passive aggressive there)."  (May 29, 2023 Saggar Email, Ex. 3 at 2 (emphasis in original).)  While the United Kingdom evidently offers Dr. Saggar

---

[3] The redactions in the emails attached as exhibits to this filing were made by counsel for Dr. Saggar's wife, not by the United States.  In the interest of protecting the privacy of Dr. Saggar, his wife, and children as much as possible, the United States did not object to the redactions when these emails were disclosed.  To the extent Dr. Saggar believes that the redacted material supports his position, he has access to the material, which comprises his own words, and is free to so argue, as he did before Judge Bodenhausen.  (Def. Saggar's Resp. to the Gov.'s "Briefing" Regarding His Mot. Seeking Permission to Travel to England to See His 93 Year Old Mother, ECF No. 71 at 3-4.)  The Government submits that the portions of the emails to which Dr. Saggar previously referred the Court fail to mitigate the overwhelming frequency with which he discusses his desire to leave the United States and the many reasons why.

8

the promise of family connections and a viable career, in the United States, "almost every hospital (Marion, Poplar Bluff, Lee's Summit) except one has kicked [Dr. Saggar] off staff." (Aug. 18, 2023 Saggar Email, Ex. 4 at 5.) According to Dr. Saggar, "Once you get a federal indictment, even if it's thrown out, you just can't easily get a job in this country. You get treated like a criminal." Dr. Saggar further states that, as of August 2023, he had a "long list of so-called friends who have suddenly vanished." (*Id.*)

Even back in May 2023, Dr. Saggar expressed that he was "indifferent to where or how [he] live[s]," suggesting, "If the universe doesn't want me to be a physician any more then perhaps I can discover something better-suited to this stage of life." (May 29, 2023 Saggar Email, Ex. 3 at 2.) His communications are riddled with statements of his desire to live a different lifestyle by abandoning all "material possessions," which he describes as his "lifelong goal." (*Id.* at 1-2.) He even tells his wife, "Yes, I do want to go and live in an ashram." (*Id.* at 2.) Finally, in a particularly troublesome comment in Dr. Saggar's August 2023 email—again, after this case was indicted—he tells his wife that he wants her to know his feelings "[i]f anything should happen to [him.]" (Aug. 18, 2023 Saggar Email, Ex. 4 at 6.)

Dr. Saggar's written statements are consistent with statements that he made to an investigator with the MBHA in September of 2022. Specifically, Dr. Saggar told the investigator that he was having family issues and was going to leave the country for London and did not know when or if he would return.

Collectively, Dr. Saggar's statements evidence not only a willingness, but a *desire*, to forgo all ties to the United States. In view of his explicit representations, Dr. Saggar should not be permitted the unusual privilege of traveling abroad while on bond.

9

**B.      The Collateral that Dr. Saggar Offers to Pledge Is Insufficient, Complex, and Emblematic of Why He Should Not Be Trusted to Travel Abroad.**

As collateral for his timely return to this United States, Dr. Saggar stated he was willing to pledge "his sister's . . . property in St. Louis (which she bought for over $1,000,000 and is unencumbered)." (Mot. to Travel Abroad, ECF No. 54 at 4.) That description of the property, however, turned out to be untrue, and the tortured history of the "collateral," summarized below, only further showcases the financial ploys that Dr. Saggar is willing to engage in, and underscores that Dr. Saggar is an individual who should not be entrusted with the exceptional privilege of traveling to his home country while on bond.

**1.      EPCI, Which Owns the Property, Is a Sham Entity that Dr. Saggar Is Using to Divert Marital Assets.**

First, the owner of the purported collateral is *not* Dr. Saggar's sister, but is instead EPCI, a sham entity designed by Dr. Saggar to receive and hold fraudulently transferred marital assets. In March 2023, the collateral, a commercial building located at 217 North 10th Street in St. Louis, Missouri, was sold by a limited liability partnership to EPCI, a Delaware corporation that was created in February 2022, slightly less than a year before Dr. Saggar filed for divorce in Missouri. Dr. Saggar contends that EPCI is wholly owned by his sister, Monica Saggar, because she is the sole shareholder of the corporation.

The documents, however, tell a different story, *i.e.*, that EPCI is, in essence, Dr. Saggar himself. Below are just a few of the red flags signaling that EPCI is a sham entity created by Dr. Saggar for the purpose of transferring marital, and possibly other, assets:

1.      **EPCI has a mailing address associated with Dr. Saggar.** According to the general warranty deed conveying the property to EPCI, EPCI's mailing address is 916 Olive Street in St. Louis, Missouri 63103. (Gen. Warranty Deed, Ex. 5 at 1.) This address is not only the same as that of the downtown urgent care clinic at issue in this case, but it is also an address affiliated with other businesses associated with Dr. Saggar, such as Saggar Holdings LLC, a Missouri

corporation organized by Dr. Saggar in 2007,[4] and Sphere Medical Group LLC, a Missouri corporation organized by Dr. Saggar in 2014.[5]

2. **EPCI and Saggar Holdings, LLC appear to be commingled.** In fact, according to the St. Louis City Assessor's Office, Saggar Holdings, LLC, whose sole organizer is Dr. Saggar himself (Saggar Holdings Articles of Organization, Ex. 8 at 1), is the listed owner of 916 Olive Street. (St. Louis City Assessor Website, Ex. 9 at 1.) Tellingly, the "owner name" of that property is not merely Saggar Holdings, LLC, but "Saggar Holdings LLC *c/o Emergency Physician Consultants, Inc.* (*EPCI)*." (*Id.* (emphasis added).)

3. **Renita Barringer, Dr. Saggar's office manager, is tied to EPCI.** Renita Barringer, Dr. Saggar's codefendant and office manager, executed the general warranty deed conveying the property on behalf of the grantee, EPCI. (Gen. Warranty Deed, Ex. 5 at 3.) The purported sole shareholder of EPCI, Monica Saggar, did not.

4. **Dr. Saggar has (or at least recently had) access to EPCI's bank accounts.** Dr. Saggar appears to be (or at least recently was) a signatory (and possibly the only signatory) on the financial accounts for EPCI. Specifically, Dr. Saggar's wife alleges that, as of at least July 2023, Dr. Saggar "was the SOLE signatory on bank accounts in the name of [EPCI], and funds being deposited into the account, and funds being paid out of the account were in his SOLE control." (Resp.'s 1st Am. Counter-Pet. for Dissolution of Marriage, Ex. 10 ¶ 23 (emphasis in original).) In response, Dr. Saggar acknowledged his access to EPCI funds, stating that "he serves in solely a signatory capacity on such accounts and is notably and legally not the owner of the funds therein," but merely "takes instructions from Monica Saggar." (Pet.'s Reply to Resp.'s 1st Am. Counter-Pet. for Dissolution of Marriage, Ex. 11 ¶ 5.)

5. **Monica Saggar, the purported owner of EPCI, appears to be uninvolved.** In fact, Monica Saggar resides in London and, according to travel records accessible to the FBI, she has not been to the United States since 2019. This is particularly concerning, given that, according to EPCI organizational meeting minutes provided by the defense to the United States, Monica Saggar "was present" for a February 14, 2022 organizational meeting of the first board of directors that "was held at 916 Olive Street, St. Louis, MO 63101." (EPCI Organizational Meeting Minutes, Ex. 12 at 4.)

Therefore, EPCI, the legal owner of the property that Dr. Saggar proposes to pledge, appears, for all intents and purposes, to be Dr. Saggar himself, not his sister.

---

[4] *See* Saggar Holdings Change of Registered Office Forms, Ex. 6 at 1, 2 (changing registered address first to 916 Olive Street, and then to address of a law firm).

[5] Sphere Medical Change of Registered Office Form, Ex. 7 at 1 (changing registered addressed from 916 Olive Street to address of a law firm).

11

### 2. The Proffered Collateral Is Insufficient to Secure Dr. Saggar's Appearance in this Matter.

As a party to Dr. Saggar's divorce proceedings, EPCI is generally prohibited by the St. Louis County Circuit Court from transferring or encumbering any of its property, such as by pledging it as collateral in a bond context.[6]  Nonetheless, following contested motion practice in the divorce case, Dr. Saggar's wife agreed that, if this Court determines in its "sole discretion" that Dr. Saggar should be allowed to travel, she would consent to EPCI's pledging of the property as collateral in the instant case.  (Nov. 29, 2023 St. Louis County Circuit Court Order, Ex. 14 at 1.) In no way was such conditional consent to "be deemed a consent or agreement from [Mrs. Saggar] as to [Dr. Saggar's] travel . . . ."  (*Id.* at 2.)  In addition, Mrs. Saggar evidently found it necessary to ensure that, in the event her husband absconds, she would be awarded five additional pieces of property owned by EPCI.  (*Id.* at 1-2.)

Dr. Saggar contends that his return is secured because, if he absconds, EPCI will lose a total of six pieces of property (only one of which would be transferred to the United States).  The ever-accumulating properties at issue here, however, merely underscore that these six properties comprise only a handful of myriad valuable assets held by EPCI, which Dr. Saggar, as the real party in interest, could easily choose to forfeit in exchange for his freedom in the United Kingdom (or elsewhere) and escaping the civil liabilities he is facing in this country.  According a September 2023 general ledger, EPCI has a host of additional properties.  (EPCI Gen. Ledger, Ex. 15, at 3-6.)  In fact, this ledger appears to be incomplete, as the very property that Dr. Saggar proposes to offer the Government (217 North 10th Street) is not listed.

---

[6] *See* St. Louis Cnty. Circuit Court Local Rule 68.3(2)(F)), Ex. 13 at 2-3 (generally prohibiting any party to a divorce action from encumbering any property during the pendency of the divorce); Nov. 29, 2023 St. Louis County Circuit Court Order, Ex. 14 at 1 (finding that EPCI is subject to the circuit court's Local Rule 68.3).

In short, Dr. Saggar is a clear flight risk who does not meet the criteria for returning to his home country while on bond, where he will have no supervision, and where he enjoys citizenship and a variety of community ties. The collateral he has offered is far from sufficient to secure his return and, when examined closely, reveals financial maneuvers that only further underscore the indicia of untrustworthiness that make him a poor candidate for international travel at this time.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that the Court revoke the Order Granting Motion to Travel (ECF No. 74) or, in the alternative, amend the conditions of Defendant Sonny Saggar, M.D.'s release to expressly prohibit international travel.

Date:   December 11, 2023                     Respectfully submitted,

                                              SAYLER A. FLEMING
                                              United States Attorney


                                              */s/ Amy E. Sestric*
                                              AMY E. SESTRIC, #66219MO
                                              CORT A. VANOSTRAN, #67276MO
                                              Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all Counsel of Record.

                                          */s/ Amy E. Sestric*
                                          AMY E. SESTRIC, #66219MO
                                          Assistant United States Attorney