UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:23-cr-00380-SRC-PLC-1 |
| ) | |
| SONNY SAGGAR, ) | |
| ) | |
| Defendant. ) | |

**Order**

The United States seeks review of an order permitting Defendant Sonny Saggar to travel internationally. Doc. 75. The Court has reviewed the matter de novo and has carefully considered the entire record. Based on the entire record, including evidence not presented to the magistrate judge, the Court finds that Saggar is a flight risk, revokes the order permitting international travel, doc. 74, and prohibits Saggar from travelling internationally.

**I.     Background**

Saggar is a medical doctor licensed to practice in the state of Missouri. Doc. 1 at 1.[1] He either owns or at one time owned several health-care-related businesses, including Downtown Urgent Care LLC, Creve Coeur Urgent Care LLC, and St. Louis General Hospital, known as SLGH. *Id.* Saggar's co-defendant, Renita Barringer, is the office manager for SLGH. *Id.*

On July 26, 2023, a federal grand jury returned a nine-count indictment, charging Saggar and Barringer with one count of conspiracy in violation of 18 U.S.C. § 371 and eight counts of making false statements related to health-care matters in violation of 18 U.S.C. §§ 1035 and 2. Docs. 1–2. According to the Indictment, the conspiracy charge stems from Saggar, Barringer,

---

[1] The Court cites to the page numbers assigned by CM/ECF.

and others allegedly conspiring to make false and fraudulent representations to Medicare and Medicaid regarding health-care services provided to make money and profit.  Doc. 2 at ¶ 26.  The eight counts of making false statements related to health-care matters stems from Saggar, Barringer, and others allegedly falsely stating and representing in claims for payments that Saggar rendered services when, in fact, individuals whose services are not reimbursable by the Medicare and Missouri Medicaid programs rendered the services.  *Id.* at ¶ 42.

On July 27, 2023, Saggar appeared for his initial appearance before a magistrate judge.  Doc. 7.  The Court listened to the audio recording of this proceeding.  The United States did not seek Saggar's detention pending trial, and the magistrate judge issued an Order Setting Conditions of Release.  Doc. 11.  In addition to standard bond conditions, the magistrate judge ordered location monitoring and a curfew for Saggar due his "foreign connections."  Pursuant to 18 U.S.C. § 3142(c)(1)(B), the magistrate judge imposed the least restrictive conditions necessary to reasonably assure Saggar's appearance and the safety of any other person and the community.  *See* doc. 11 at 2–3.  That same day, the magistrate judge held a bond-execution hearing and, in accordance with Pretrial Services' recommendation, modified the conditions of release to authorize Saggar to drive to the Southern District of Illinois and the Western District of Missouri for employment purposes only.  Docs. 13, 17.

On August 24, 2023, the Court received an Informational Report from Pretrial related to Saggar.  Doc. 43.  According to the Report, on August 1, 2023, Saggar admitted to Pretrial that he had contact with Barringer "at work" and stated that he "just wanted to give her a hug."  *Id.* at 2.  Saggar also indicated that Barringer told him multiple times during their conversation that they were not to have any contact with each other, but Saggar told her it was okay since his attorney advised him that he could have contact with Barringer if they did not discuss the case.

2

*Id.* at 2. Pretrial verbally reprimanded Saggar for violating his conditions and stressed the potential implications of violating such a condition of his bond. *Id.*

The Report also notes that Saggar has provided inconsistent information about his past and current roles with the three companies mentioned in the Indictment (i.e., Downtown Urgent Care LLC, Creve Coeur Urgent Care LLC, and SLGH) and whether he was receiving pay. *Id.* Saggar reported to Pretrial that he sold the three companies in May 2022 to a company named EPCI, which Saggar claims is owned by his sister. *Id.*

In the Report, Pretrial notes that Saggar's offense presents a risk to the community:

> The alleged instant offense presents a risk to the safety of the community because it entails not only the fraudulent reporting and billing of medical services but the alleged provision of medical care by individuals who were not qualified to provide such a level of care without proper supervision. The patients who were allegedly being treated believed they were being treated by medical professionals with the proper training [to] do so.

*Id.* at 3.

In early August 2023, Saggar moved to modify his bond conditions. Docs. 34, 36. Saggar indicated that he no longer worked in the Southern District of Illinois but that he does still work in the Western District of Missouri and must sometimes stay overnight in Sedalia. *Id.* The magistrate judge modified Saggar's conditions to allow him to travel to the Western District of Missouri and to stay overnight for work purposes. Doc. 37. The magistrate judge ordered Saggar to provide a work schedule to Pretrial for approval in advance of any work-related travel to the Western District of Missouri. *Id.* Additionally, the magistrate judge removed Saggar's authorization to travel to the Southern District of Illinois without prior authorization. *Id.*

The following day, Barringer moved to modify the conditions of her bond to allow her and Saggar to meet and discuss the case pursuant to a joint defense agreement. Doc. 38. The

3

magistrate judge granted Barringer's request; however, he ordered that Barringer and Saggar could not discuss the case with each other outside the presence of their attorneys. Doc. 41.

In late September and early October, Saggar and Barringer filed a Motion to Strike Portions of the Indictment and a Motion to Dismiss the Indictment Based on the Court's Lack of Jurisdiction, which remain pending, but which United States Magistrate Judge Patricia L. Cohen recommends denying. *See* docs. 47, 49, 80.

On September 29, 2023, Saggar traveled to the Southern District of Illinois without obtaining permission. Doc. 50 at 1. Pretrial verbally reprimanded Saggar for traveling outside the Eastern District of Missouri and reiterated that Saggar cannot travel outside this district without the Court's approval. *Id.* at 2. In its Violation Report, Pretrial notes that Saggar said that he would be working as a property manager for his sister's properties in St. Louis. *Id.* at 1–2. Saggar said his sister's company, ECPI, owns ten to fifteen properties in Missouri. *Id.* at 2. However, Saggar could not provide verification of employment by EPCI. *Id.; see also* doc. 76 at 4.

On October 25, 2023, Saggar filed a Motion Seeking Permission to Travel to England to See his 93-Year-Old Mother. Doc. 54. Saggar argues that the United States' "unexplained reasons discovery production is taking such an extended period of time," along with "Mrs. Saggar's age, and because the case against Dr. Saggar is not what it appeared to be when presented to the grand jury," there is "reasonable justification to permit him to travel to England for a short visit with his mother." *Id.* at 4. Basically, Saggar blames an outside billing service for the false billings, claiming the service simply misunderstood the proper method of billing. *Id.* at 3. Additionally, Saggar contends that he is "willing to do such travel under any conditions

4

the Court deems appropriate, including his sister's willingness to put up property in St. Louis (which she bought for over $1,000,000 and is unincumbered) to ensure his timely return." *Id.*

Two days later, the United States filed a response opposing Saggar's motion to travel. Doc. 56. According to the United States' response, Pretrial also opposes Saggar's motion. *Id* at 2. The United States claims that Saggar is a substantial flight risk. *Id.* at 1–2. According to the United States, "Saggar has extensive familial ties to the United Kingdom, as well as dual citizenship of both the United Kingdom and the United States," and "Saggar's familial, employment, and property ties to the United States have significantly diminished in recent months." *Id*. To support its position, the United States contends that "Saggar is in the midst of a contentious divorce, and his soon-to-be ex-wife has accused him of selling and transferring martial assets;" "Saggar is no longer employed in the various locum physician positions that he originally reported having to Pretrial;" "[Saggar] was granted permission to change his residence to a property owned not by himself, but by his sister;" and "[Saggar] has already twice violated the conditions of his bond in the first three months of supervision." *Id.* at 2.

The United States also claims that, in a September 2022 interview, Saggar informed an investigator with the Missouri Board of Registration for the Healing Arts that he was having family issues and was going to leave the country for London and did not know when or if he would return. *Id.* According to the United States, when federal law enforcement officers executed a search of his downtown urgent care on July 27, 2023, they found a letter on his desk from the MBRHA requiring him to appear for a "closed meeting" in Jefferson City that day—the very same day on which Saggar had a flight scheduled from Detroit to London. *Id.*

Lastly, the United States requests that the Court decline Saggar's request to use his motion to travel as a vehicle by which to address factual disputes that will be resolved by a jury.

5

*Id.* at 3.  At trial, the United States says it will put on evidence to establish that Saggar and Barringer were responsible for the fraudulent claims for payment made to Medicare and Medicaid.  *Id.*

Four days later, Saggar filed a reply disputing many of the United States' arguments.  Doc. 58.  Saggar claims that he is not a substantial flight risk.  *Id.* at 1.  He says that he is a United States citizen, has lived here since medical school, has been an emergency doctor in the United States for 26 years, and was a military contractor for the US Navy.  *Id.* at 1.  While Saggar admits that his employment has suffered due to his Indictment, he hopes to begin practicing again in November.  *Id.*  Additionally, while Saggar admits that he is in the midst of a divorce, he says that his children were all born in the United States and two of the three live here now.  *Id.*

As to the MBRHA interview, Saggar denies that he said that he was having family issues and was going to leave the country for London.  *Id.*  Saggar says that even if he had made such a statement, it was a year before he was arrested and learned of the FBI investigation.  *Id.*  As for the "closed meeting," Saggar claims that he made his flight reservation a full week before the notice for the July 27, 2023 meeting was issued.  *Id.* at 2.

Saggar says that the United States is incorrect that he had two bond violations.  *Id.*  He says the first was only an "Informational Report."  *Id.*  The Court notes that the "Informational Report" states that "[t]he defendant was verbally reprimanded for *violating* the Court's Order Setting Conditions of Release." Doc. 43 at 2 (emphasis added).  Saggar admits that the second report was a violation in which he traveled to the Southern District of Illinois without Pretrial's knowledge and consent.  Doc. 58 at 2.  However, Saggar claims that his mistake actually shows

6

that he is not a flight risk because he came back within an hour and before Pretrial raised any issue. *Id.*

Further, Saggar says that "[a]rresting an individual based only on probable cause, requesting restrictive bond conditions, then stretching discovery out at least half a year and opposing an expedited hearing on a motion which might dispose of the case is not fair to any defendant" and "is reasonable justification to permit him to travel to England for a short visit with his mother." *Id.* at 3–4.

On November 13, 2023, the magistrate judge set a November 20, 2023 hearing on Saggar's motion to travel. Doc. 66. Two days before the hearing, on Saturday, November 18, 2023, the United States filed a pre-hearing brief. Doc. 69. In the brief, the United States claims that the $1,000,000 property that Saggar has pledged to secure his timely return to the United States is not owned by Saggar's sister as Saggar claimed. *Id.* at p. 1. Instead, the United States says, the property "is owned by a sham entity designed by Dr. Saggar to receive and hold fraudulently transferred marital assets." *Id.* The United States asserts that the "sham entity" is named Emergency Physician Consultants, Inc. and, because of its suspicious nature, EPCI is a party to Saggar's ongoing divorce proceedings and is prohibited by the Circuit Court of St. Louis County, Missouri from encumbering any of its real property during the pendency of Saggar's divorce proceedings. *Id.* at 1–2. According to Saggar's wife, Saggar transferred approximately 19 pieces of real estate to his sister through EPCI. Doc. 69-12 at ¶ 8. Saggar's wife says the value of the properties is unknown but exceed several million dollars and far exceeds any property in Saggar's and his wife's name. *Id.*

Additionally, the United States reiterates that Saggar is a flight risk. Doc. 69 at 2, 5–6. According to the United States, it received emails in which Saggar "informed his wife that he has

7

nothing left in the United States, that he wishes to move to England, and that he is willing to relinquish child custody." *Id.* at 3; *see also* doc. 78-1.

On November 20, 2023, the magistrate judge held a hearing on Saggar's motion to travel. Doc. 70. As noted, the Court has listened to the audio recording of this hearing. Saggar moved for a continuance at the hearing to have time to respond to the United States' filing. The United States opposed the continuance, but the magistrate judge ultimately agreed to continue the hearing to give Saggar an opportunity to respond.

On November 30, 2023, Saggar responded to the United States' brief. Doc. 71. According to Saggar, the judge in the divorce proceedings, his wife and her counsel, and EPCI have blessed the use of the property as security for Saggar's federal bond. *Id.* at 2. Saggar attaches a Judgment/Order signed by the judge in his divorce case to support his argument. Doc. 71-5. As part of the Judgment/Order, Saggar also "agreed to put up five additional properties within the divorce proceedings to protect [his wife]" in the event he fails to return from England. Doc. 71 at 2.

As to Saggar's emails to his wife, Saggar says that the United States' "psychoanalysis of [his] writings to his wife, if nothing else, is certainly offensive." *Id.* at 3. Saggar claims that his expressions to his wife that he wanted to give up his material possessions does not in any way support the United States' claim that he has "a desire to forego all ties to the United States." *Id*. Saggar goes on to complain about the redactions contained in the emails and says that the United States' "selective discussion of partial sentences and twisting of an emotional man's words is disappointing to say the least." *Id.* at 4.

On December 4, 2023, the magistrate judge held a hearing on Saggar's motion to travel to England. Doc. 72. The Court also listened to the recording audio of this hearing. At the

8

hearing, the United States argued that even with the Judgment/Order entered by the St. Louis County Court, it would still be a complicated process to acquire the property that Saggar has offered as collateral.  Defense counsel argued that the Judgment/Order is clear that the United States would acquire the property if Saggar fails to return.  Defense counsel also contends that Saggar has even more exposure if he doesn't return because he has pledged five other properties to his wife in the event that he doesn't return to England.  When asked about who would sign the security for his bond, Saggar said EPCI's counsel has the authority to do so.  The United States agreed that it could extradite Saggar from England should he fail to return but in later briefing expressed some concerns about the extensive time and resources necessary to extradite Saggar should he abscond.  *See* doc. 76 at 6.  The United States then repeated the arguments set forth in its briefs at the hearing.  According to the United States, Saggar is not a good candidate for the extraordinary privilege of traveling internationally on bond.

At the hearing, the magistrate judge commented that Saggar "has a lot to lose" should he fail to return from England.  Saggar could lose several properties and face incarceration.  After the hearing, Saggar supplemented his motion to include flight information for the flights he booked to and from London.  Doc. 73.  That same day, the magistrate judge granted Saggar's motion to travel but stayed bond execution pending review by the district court.  Doc. 74.  Ultimately, the magistrate judge found that the United States' concerns about Saggar fleeing "can be reasonably addressed with the security pledge and the likelihood of extradition and additional prosecution should [Saggar] betray the Court's trust." *Id.* at 3.  The magistrate further says that the United States can use other means, such as an Interpol Red Notice, that would greatly restrict, if not eliminate, Saggar's ability to travel outside of England, thus increasing the likelihood of successful extradition.  *Id.*

9

On December 11, 2023, the United States filed a motion requesting the district court to review the magistrate judge's order.  Doc. 75.  The United States reiterated that Saggar is a substantial flight risk because his ties to the United States are weakening and argues that the United Kingdom's extradition treaty is not sufficient security to reasonably assure the appearance of Saggar, since it would take extensive time and resources to enforce it if Saggar absconds.  Doc. 76 at 6–9.  In addition to his present criminal prosecution, which exposes him to potential incarceration, the United States says that Saggar also faces many civil liabilities.  *Id.* at 6–7.  According to the United States, Saggar's urgent care entities are facing a judgment of over $95,000, Saggar and his entities are liable for yet another $210,000 in a separate federal Fair Labor Standards Act case, Saggar is the target of a parallel federal civil investigation that would subject him to treble damages and mandatory penalties, Saggar is in the midst of a contentious divorce, and Saggar's medical license is at risk due to an ongoing investigation by MBRHA.  *Id.*

The United States says that Saggar's own statements confirm his desire to leave the United States.  *Id.* at 8–9.  In a May 29, 2023 email, Saggar told his wife that "[he is] willing to give [her] all [their] marital assets (the house and land, totaling 19 acres and probably worth almost $1 million in equity), and as much child custody as [she] want[s]."  Doc. 78-1.  Saggar goes on to say that "[a]s [he] embark[s] on having a simpler life, it would be foolish for [him] to retain any of the property.  [He is] walking away from all possessions."  *Id.*  Additionally, Saggar says:

> What began as frustration with regard to not being able to find work has transformed into acceptance that perhaps I should do something else.  Yes, I do want to go and live in an ashram.  Yes, I do want to go and live in England again.  If the universe doesn't want me to be a physician any more then perhaps I can discover something better-suited to this stage of life.

10

*Id.* In an August 18, 2023 email, Saggar told his wife:

> [His] income is not even a shadow of what it once was and at least one of [his] kids doesn't want to know [him], and [his] Mum is turning 93 next month. [He is] still licensed and welcome to work as an ER doc in the UK, albeit for a much lower income.

Doc. 78-2 at 5.

Finally, the United States contends that the collateral that Saggar offers to pledge is insufficient, complex, and emblematic of why he should not be trusted to travel abroad. Doc. 76 at 10–12. The United States again reiterated that EPCI, which owns the property, is a sham entity that Saggar is using to divert martial assets and that the proffered collateral is insufficient to secure Saggar's appearance in the matter. *Id.* While Saggar contends that his return is secured because, if he absconds, EPCI will lose a total of six pieces of property (only one of which would be transferred to the United States), the United States says the six properties comprise only a handful of myriad valuable assets held by EPCI, and that Saggar could easily choose to forfeit the six properties in exchange for his freedom in the United Kingdom (or elsewhere) and escaping the civil liability he is currently facing in the United States. *Id.* at 12.

As such, the United States asks the Court to revoke the magistrate judge's order granting Saggar's motion to travel, doc. 74, or, in the alternative, amend the conditions of Saggar's release to expressly prohibit international travel. Doc. 76 at 13.

On December 12, 2023, Saggar filed a response opposing the United States' motion. Doc. 79. First, Saggar argues that he has not been a problem on bond. *Id.* at 2–3. In support, Saggar points to the magistrate judge's order, which states that Saggar has had no significant issues while on pretrial release and has performed satisfactorily. *Id.* Second, Saggar says that the United States has misrepresented the letters to his wife. *Id.* at 3–4. Saggar says that nothing in his communications to his wife indicate that he would be willing to break the law to live in

11

England again.  *Id.* at 3.  Saggar again complains of about the redacted emails the United States submitted, but he does not file unredacted copies of the emails to support his claims.  *Id.* at 4.  (Considering he sent the emails, the Court assumes that Saggar has copies of them, and that he could have filed unredacted copies.)  Third, Saggar says the property that he has offered as collateral is fully available.  *Id.* at 5–6.  Fourth, Saggar contends that the magistrate judge's conclusion permitting travel was in the interest of justice and correct.  *Id.* at 6.  Lastly, Saggar claims that he offered to waive any potential opposition to extradition, but the United States did not accept his offer.  *Id.* at 8.

Saggar says that "[the magistrate judge] makes [decisions on bond conditions] almost daily" and "suggests the magistrate judge's decision should be given the consideration he has earned through his many years of evaluating bond conditions."  *Id.* at 2.  Saggar claims that the United States is doing a disservice by presenting arguments and "evidence" never presented to the magistrate judge.  However, Saggar cites to no authority that says the Court cannot consider new evidence.  Saggar does not contest the civil judgments, and he concedes that this Court must conduct de novo review.  *See id.*

On December 22, 2023, the United States filed a reply in support of its motion for review.  Doc. 81.  The United States claims that nothing in Saggar's response alters the two critical points that warrant denial of Saggar's motion to travel.  *Id.* at 1.  First, the United States says that "allowing him to travel internationally would be an unreasonable amendment to the conditions of his release, because, in his own written words, Dr. Saggar does 'want to go and live in England again,' and is even willing to relinquish custody of his children."  *Id.* (citing doc. 78-1 at 1–2).  Second, the United States says, that "when examined closely, the property that Dr. Saggar seeks to offer as collateral illuminates the lengths to which he is willing

12

to engage in financial maneuvers to attempt to avoid legal accountabilities." Doc. 81 at 2. As to the redacted emails, the United States says the redactions were already present when it received the emails from counsel for Saggar's wife. *Id.* at 1.

Finally, the United States argues that the Court can consider evidence not presented to the magistrate judge and asks the Court to consider an additional lawsuit filed by Saggar's wife on December 19, 2023, in the Circuit Court of St. Louis, Missouri. *Id.* at 2–3; s*ee also Saggar v. Saggar et al.,* Case No. 23SL-CC05399. In that case, Saggar's wife accuses Saggar, Barringer, and others of fraudulently transferring 19 properties—including the one that Dr. Saggar seeks to pledge as collateral here—to EPCI. Doc. 81-1. Saggar's wife also alleges that, immediately before Saggar filed for divorce, he withdrew approximately $500,000 from an investment account and deposited those funds into the bank account that he solely controls, in the name of EPCI. *Id.* Saggar's wife seeks not only damages, but also a constructive trust "on all real estate fraudulently and wrongfully" transferred by Saggar and Barringer to EPCI. *Id.* Thus, the United States says the ownership of the purported collateral is now being litigated in yet another case that, if successful, will result in a judgment ordering its return to Saggar's wife. *Id.* As such, the United States asks the Court to revoke the magistrate judge's order or amend the conditions of Saggar's release to expressly prohibit international travel. *Id.* at 5.

**II.     Standard**

The United States requests review of the magistrate judge's order under 18 U.S.C. § 3145(a), which provides:

> If a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court—

13

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release; and
>
> (2) the person may file, with the court having original jurisdiction over the offense, a motion for amendment of the conditions of release.

The motion shall be determined promptly.

"When the district court . . . acts on a motion to revoke or amend a magistrate's pretrial detention order, the court acts de novo and makes an independent determination of the proper pretrial detention or conditions for release." *United States v. Maull*, 773 F.2d 1479, 1484 (8th Cir. 1985) (quoting *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985). The rule of de novo determination by the district court applies not only when the accused challenges the magistrate's order, but also when the United States does, as it is authorized to do by section 3145(a)(1)." *Maull,* 773 F.2d at 1485 (quoting *Fortna,* 769 F.2d at 250).

"In reviewing the order of the magistrate, the district court must engage in this same analysis [as the magistrate]." *Maull,* 773 F.2d at 1482. "Only after determining that release upon personal recognizance or an unsecured appearance bond will not reasonably assure appearance or will endanger the safety of others (*see* 18 U.S.C. § 3142(b)), may the judicial officer then proceed to consider the conditions set out in section 3142(c)(2)(A)-(N)." *Maul,* 773 F.2d at 1482. The Court must order "any . . . condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." *See* 18 U.S.C. § 3142(c)(1)(B)(xiv).

### III.     Discussion

While on released bond, Saggar makes the "unusual request" to travel abroad to England—where he is a citizen and has extensive familial ties. Based on the evidence not

14

presented to the magistrate judge, coupled with the evidence the magistrate judge considered, the Court finds that Saggar is a flight risk.

Addressing first Saggar's position that the Court should not, or need not, consider evidence presented to the Magistrate Judge, this argument fails. As Saggar concedes, this Court must conduct de novo review. Doc. 76 at 2; *Maull*, 773 F.2d at 1481–85. On de novo review, "the 'weight due' to a [lower] court's finding is zero." *Ornelas v. United States*, 517 U.S. 690, 705 (1996) (Scalia, J., dissenting). The reality is that time lapses occur from the time conduct at issue occurs, and from when a party files a motion until the magistrate judge decides it, and then from the time a party seeks review until the time the district court decides it. And regardless of whether a defendant is on bond or in custody, new facts often arise, for example, when a defendant commits a crime or flees the jurisdiction, or as here a new lawsuit is filed, during those time lapses. Saggar's position would result in the absurd proposition that a court on de novo review could not consider those new facts. If a magistrate judge had to consider every fact before a district court could consider it, the result would be an endless doom loop in which a district court could never review the magistrate judge's order at all.

Saggar's ties to the United States are quickly deteriorating. Saggar is facing a nine-count federal indictment, which could result in his incarceration. Docs. 1–2. Additionally, Saggar is the target of a parallel federal civil investigation that would subject him to treble damages and mandatory penalties. Doc. 76 at 7. Saggar faces many other civil liabilities. Saggar is in the midst of a contentious divorce, his urgent care entities are facing a judgment of over $95,000, and he and his entities are liable for yet another $210,000 in a separate FLSA case. Doc. 56 at 2; doc. 76 at 6–7. He also faces a lawsuit by his wife accusing him of fraudulently transferring

15

assets.  Doc. 81 at 3.  Saggar's medical license is also at risk due to an ongoing investigation by MBRHA.  Doc. 76 at 7.

Further, by Saggar's own admissions, he wants to live in England again, is willing to relinquish child custody, and wishes to pursue a career abroad.  Docs. 78-1, 78-2.  Saggar's statements about wanting to leave the United States cause concern.  Saggar has stated to his wife that he desires to live in an ashram.  Doc. 78-1 at 2.  The United States places great significance on this statement as indicative of his mindset for leaving the United States.  *See* doc. 69 at 6; doc. 76 at 2, 9; 78-1 at 2; *see also ashram,* Collins, https://www.collinsdictionary.com/us/dictionary/english/ashram (last visited Jan. 26, 2024) (defines ashram as "a secluded place for a community of Hindus leading a life of simplicity and religious meditation.").  Saggar asks the Court to rely on redacted portions of the emails, and accuses the United States misrepresenting them, but given that Saggar authored the emails, he could have disclosed the entirety of the emails to the Court but chose not to.  *See* doc. 71 at 3–4; doc. 79 at 4.

While Saggar has offered to put up a property in St. Louis—217 N. 10th, which is allegedly worth over $1,000,000—as collateral, the record is unclear on what interest Saggar has in the proposed collateral.  Saggar claims that his sister owns EPCI, which in turn owns the proposed collateral.  Doc. 71 at 1.  However, the United States claims that EPCI is a "sham entity" created to hide Saggar's assets.  Doc. 69.

Last month, Saggar's wife filed suit against Saggar, Barringer, and others, accusing them of fraudulently transferring 19 properties—including the property Saggar has pledged as collateral—to EPCI.  *See* doc. 81-1.  Saggar's wife also alleges in the suit that, immediately before Saggar filed for divorce, he withdrew approximately $500,000 from an investment

16

account and deposited those funds into a bank account that he solely controls, in the name of EPCI. *Id.*

If Saggar's sister does own that property or is the principal of EPCI, which in turn owns the property, the record does not show that she has any interest in seeing that Saggar returns to the United States. Saggar's sister resides in England and has only traveled to the United States a few times in her life. Doc. 81-1 at 4. It is unclear if Saggar's sister is a citizen of the United States or whether the Court has personal jurisdiction over her, further underscoring her lack of interest in seeing that Saggar returns to the United States.

Additionally, the Court lacks information regarding Saggar's net worth and the value of 217 N. 10th Street in relation to his net worth. If the collateral is only a small fraction of Saggar's net worth, loosing it wouldn't provide much incentive to return to the United States. In addition, Saggar and EPCI apparently have other properties, but have not offered them as collateral, which creates further questions about Saggar's intentions about returning to the United States. Saggar also has offered to convey the property—and all his other property—to his wife, indicating that the property has little to no value to Saggar himself, or that having the property seized by the United States would not have any significant impact on Saggar. Lastly, Saggar already stands to lose the property, or his interest in it, as a result of both the pending divorce proceedings and the pending civil suit.

As such, the Court observes that offering the property as collateral may well be an illusory offer. At best, the collateral appears to have questionable value, and Saggar himself may have little to no ownership interest in it. At worst, it could have no value to Saggar. If Saggar's wife is awarded the property either in the divorce proceeding or in the new lawsuit, having pledged the property would provide little to no incentive for Saggar to return.

17

The United States argues, and Saggar does not dispute, that it would take extensive time and resources to enforce extradition if Saggar absconds. Doc. 76 at 6; doc. 79. While Saggar has offered to sign a waiver of his right to contest any extradition, the United States says Saggar's offer is an "empty gesture." Doc. 76 at 6 (citing *United States v. Zhang*, No. 22-CR-208-4 (CBA), 2022 WL 17420740, at *5 (E.D.N.Y. Aug. 3, 2022) ("Zhang's agreement to waive extradition is 'an empty gesture' which 'comes into p[l]ay only after [he] has fled the Court's jurisdiction' and is of unclear enforceability.") (citation omitted) (alteration in original). "The Department of Justice's Office of International Affairs is unaware of any country anywhere in the world that would consider an anticipatory extradition waiver binding. And, of course, the defendant could choose to flee to a jurisdiction with which the United States does not have an extradition treaty." *United States v. Epstein,* 425 F. Supp. 3d 306, 325 (S.D.N.Y. 2019 (citation omitted).

Saggar's offer to waive opposition to extradition is of questionably validity. Saggar is a dual citizen, and as a citizen of England, he could travel from England to a country without an extradition treaty with the United States before the United States authorities become aware of it. A Red Notice, which the magistrate judge suggests, "is a request to law enforcement worldwide to locate and provisionally arrest a person *pending* extradition, surrender, or similar legal action;" which is of little value here. INTERPOL, Red Notices, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited Jan. 26, 2024) (emphasis added).

Lastly, during the pendency of the Court's consideration of this matter, Saggar has filed another motion to modify his conditions of his release, doc. 95; in that motion, Saggar argues that his retaining new counsel "demonstrate[es] his intention and resolve to litigate this matter,

18

which stands in stark contrast to any speculation as to a flight risk." Doc. 95 at ¶ 25. The Court here makes no determination on that motion, as it is committed to a magistrate judge in the first instance. Insofar as Saggar's comment at paragraph 25, however, bears on this Court's flight-risk analysis, the Court observes that further delay of this case does not decrease but instead increases the risk of flight.

### III.  Conclusion

For all of these reasons, the Court finds that Saggar is a flight risk. Accordingly, the Court revokes the order permitting travel, doc. 74, and modifies Saggar's conditions of release to prohibit international travel. All other conditions of Saggar's release, doc. 11, as modified by any order other than doc. 74, remain in effect. The Court denies as moot the United States' Motion for Leave To File Under Seal, doc. 77.

So ordered this 31st day of January 2024.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE