UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:23-CR-00380-SRC |
| | ) | |
| SONNY SAGGAR, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

# **DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**

Defendant Sonny Saggar, through Attorney William Marsh, respectfully requests that this Honorable Court grant a downward variance and impose a sentence of time served, followed by any allowable term of supervised release. Under the unique circumstances of this case, such a term is sufficient, but not greater than necessary to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a). In support, he states:

Before going into custody on the day of his plea, Sonny Saggar had never been confined a day in his life. Understandably, he was terrified. And yet, as the arc of his case has seen him evolve from deniability to accountability, his headspace during confinement has evolved from from apprehension to gratitude. Sonny views the last six months as one of the most meaningful and transformative periods of his life, and he presents himself for sentencing with a sense of clarity and purpose that he could never have even contemplated prior to his incarceration. As someone who has used his jail time as an opportunity for personal growth and service to others, it appears that any additional incarceration would not serve the spirit of § 3553(a). Accordingly, Dr. Saggar

asks that the Court sentence him to a term of time served and impose any statutorily permissible term of supervised release that It deems fit.

Counsel distinctly remembers his first remote meeting with Dr. Saggar from the Alton jail. While bracing for potential reproach, he was both surprised and relieved to see Sonny enter the room radiating a sense of calm. He described his new reality as a "necessary course correction," and vowed to use the time between August 15, 2024 and February 19, 2025 as wisely and productively as possible. Keeping true to his word, Sonny has spent the last six months carefully examining his flaws, striving for personal expansion, and leveraging his education to help inmates with less privileged backgrounds understand the importance of academic growth and orient themselves towards healthier lifestyles.

On the personal side, Sonny has spent the last half-year cultivating self-awareness as it relates to his so-called shadow qualities—especially hubris and pride. Like many physicians, he grew up performing very well in school, which led to effusive praise throughout his childhood and adolescence. As such, Sonny's young ego developed a sense of flawlessness that would only be bolstered by future achievements. He was accepted into the University of Oxford—one of the most prestigious schools in the world—in 1986 and entered medical school in London six years later. After graduating in 1995, his trajectory as a high achiever continued through an internal medicine residency followed by a successful public career. Before his arrest, Dr. Saggar had been the subject of myriad positive news stories, a guest on local radio shows, a respected voice against the city's endemic gun violence, a beloved volunteer, and a strong advocate for people living in medically underserved communities. Over time, Sonny became accustomed to being revered. This enabled him to process his Indictment with an incomplete sense of self-awareness, rendering it easy to adopt a litigious posture that left little room for acceptance of responsibility.

Given his high-achieving background, Sonny's initial resistance to accountability makes sense. It also makes his transformation more remarkable. Admitting that he could even be capable of wrongdoing—much less acknowledging it publicly—was a tall order for a man whose ego had been fortified by a lifetime of reverence and seemingly flawless adherence to conventional models of success. And yet, the undersigned vividly recalls the "aha" moment when Sonny shifted gears and acknowledged the reality of his wrongdoing.

It happened during one of the many meetings when Dr. Saggar and counsel were discussing their differing views as to what one could deduce from the Government's evidence. Somehow, the conversation turned toward psychology—something Sonny is decently versed in given that his education is not just advanced, but also British. He is particularly keen on turn-of-the-century Swiss psychologists—specifically their identification of and attempts to map the unconscious. At one point in the conversation, Sonny uncharacteristically brought it to an abrupt halt, looked up, and matter-of-factly stated, "I don't think I've ever acknowledged there's a part of me that's bad." This was a profound admission for Sonny, and it marked a 180-degree turn for his case. Shortly after realizing that he—like any human—could harbor unsavory proclivities, Dr. Saggar authorized the waiver of pretrial motions. Less than two months later, he came before the Court and formally accepted responsibility for his conduct by entering a plea of guilty (something that may have happened sooner had he not been in the throes of a contested divorce).

Since being taken into custody, Sonny's initial act of acceptance has blossomed into a full-fledged journey of self-discovery. Through meditation, avid reading, journaling, and philosophical discussions with anyone in the jail who is willing to have them, Sonny has adopted an attitude of humility that would have been unrecognizable eight months ago. He still acknowledges that there is considerable work ahead: for instance, his divorce—ongoing through the pendency of this

case—will occasionally constellate impulses toward pettiness. But Sonny now recognizes and can identify these negative thoughts, thus giving him a sense of agency over them. Through the process of careful self-observation and honest self-analysis, Sonny has put himself on the best trajectory possible to ensure success moving forward. By becoming vulnerable, he has made himself amenable to positive change—the ultimate end game if one is to view the criminal adjudication process through a lens of correction.

In addition to working on himself, Sonny has devoted considerable time and attention to the needs of his fellow inmates over the last half-year. He has used his knowledge as a physician to promote physical wellness to a population that is historically naïve on that front. He tutors detainees who are attempting to advance their education—and actively encourages those who are less inclined to do so. He leads daily prayer groups. He helps people with literacy issues complete paperwork. The list goes on. Sonny has been more than just a role model within the jail. He has been an invaluable helper, making life easier for his fellow inmates *and* the corrections officers who are tasked with supervising them.[1] Sonny hopes to continue serving carceral populations after his own release from confinement, as the last six months have cast significant light on what he now recognizes as an underserved subculture—one that he can help in profound ways given the unique intersection of his professional credentials and recent life experience.

While Dr. Saggar understands that a criminal conviction could affect his ability to practice medicine, he also believes that he is employable given his education and experience. Aside from his simple desire to offer meaningful contribution to society, one of Sonny's chief concerns is restitution. Knowing he will have a substantial obligation—and wanting to pay it as quickly as

---

[1] Counsel has never seen an inmate treated as respectfully and reverentially by corrections officers as Dr. Saggar over the full course of his 16-year career in criminal defense—a sign that his presence truly has had a net positive effect on the entire eco system within the jail.

possible—Sonny has communicated with multiple recruiters who represent medically underserved communities and value his skill set as an ER physician (and are also aware of his pending charges). Apart from opportunities to continue working with inmates, Sonny has been solicited by understaffed hospitals on Indian reservations and in rural communities. The sooner he is released from confinement, the sooner Sonny can work—and he knows that meaningful opportunities await.

Dr. Sonny Saggar is a man who fell prey to pride but has since summoned the courage to question himself and take corrective measures. What began with an uncomfortable recognition of general fallibility quickly morphed into a full-fledged acceptance of responsibility on August 15, 2024. Since his plea, Sonny has continued investing significant energy into recognizing his faults and becoming a better human—all the while being confined in a jail cell. From a practical standpoint, he is not faced with the barriers that challenge most criminal defendants. He is highly educated, has no prior criminal history, can easily hit the ground running once released from confinement, and is eager to begin making the Government whole. While the last six months of confinement have been enlightening, they have also been difficult; nevertheless, Sonny knows as a physician that healing cannot happen without pain. Given this recognition, he urges the Court to find that the time already served has been sufficient, but not greater than necessary to accomplish the sentencing objectives set forth in § 3553(a). Accordingly, he asks that the Court sentence him to a term of time served and place him under the supervision of the federal probation office when he appears for sentencing.

WHEREFORE, Defendant Sonny Saggar respectfully requests that this Honorable Court grant his request for a downward variance and sentence him to a term of time served, to be followed by any statutorily allowable term of supervised release that the Court deems fit.

Respectfully submitted,

/s/ William Marsh
William Marsh, #60906MO
1401 South Brentwood Boulevard, Suite 500
St. Louis, Missouri 63144
Phone: (314) 455-5555
Fax: (314) 727-2869
E-Mail: William.Marsh@KesslerWilliams.com

*Attorney for Defendant Sonny Saggar, M.D.*

## CERTIFICATE OF SERVICE

I certify that on February 11, 2025, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the Assistant United States Attorney.

/s/ William Marsh
William Marsh